RENDERED: OCTOBER 17, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0304-ME

A.J.                                                                                          APPELLANT


APPEAL FROM LAUREL FAMILY COURT
v.       HONORABLE STEPHEN MICHAEL JONES, JUDGE
ACTION NO. 22-AD-00027


A.J.J. JR., A MINOR CHILD;
COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES; AND K.B.                                          APPELLEES

AND

NO. 2024-CA-0305-ME

A.J.                                                                                          APPELLANT


APPEAL FROM LAUREL FAMILY COURT
v.       HONORABLE STEPHEN MICHAEL JONES, JUDGE
ACTION NO. 22-AD-00028


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES; K.B.; AND
M.M.J., A MINOR CHILD                                                  APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; CETRULO AND MOYNAHAN, JUDGES.

CETRULO, JUDGE:  These appeals are taken from the Laurel Family Court's findings of fact, conclusions of law, and judgments terminating the parental rights of A.J. ("Father") to his two minor children.  Appointed counsel for Father filed an *Anders*[1] brief in accordance with *A.C. v. Cabinet for Health and Family Services*, 362 S.W.3d 361 (Ky. App. 2012), conceding that no meritorious assignment of error exists for appeal; requesting to withdraw as counsel; and, providing Father with the opportunity to file a *pro se* brief.  No *pro se* brief has been filed, and counsel's motion to withdraw is granted by separate order.  After independently examining the record and the law, we find no error and affirm the Laurel Family Court's order terminating Father's parental rights.

## FACTS AND PROCEDURAL HISTORY

Father and K.B. ("Mother")[2] were not married but had two children together:  A.J.J. Jr. ("Child 1") was born in 2013, and M.M.J. ("Child 2") was born

---

[1] *Anders v. California*, 386 U.S. 738 (1967).

[2] Mother was present at the termination hearing and represented by counsel.  She did not contest the termination of her parental rights at the trial level nor has she on appeal.  This Opinion, therefore, considers only the family court's termination of Father's parental rights.

in 2014. Father is listed on Child 1's birth certificate. Father is not listed on Child 2's birth certificate, but Mother identified him as the biological father.[3]

The Cabinet for Health and Family Services ("the Cabinet") had been involved with this family since 2015 due to domestic violence and substance abuse issues. At some point in 2020, Father left the children in Mother's care, and in October of that year, the Cabinet filed neglect petitions against Mother alleging substance abuse while in a caretaking role. The children were placed in foster care on March 25, 2021, where they have remained throughout the case.[4] Following the adjudication hearing, the family court entered its order finding neglect on May 10, 2021. A disposition hearing was held on June 4, 2021, wherein the family court found that reasonable efforts had been made to prevent the children's removal from their home and ordered the children's continued commitment to the Cabinet.

By December 2021, the permanency goal had been modified to adoption. On May 12, 2022, the Cabinet petitioned to terminate Father's parental rights. The family court held an evidentiary hearing on November 20, 2023. Several witnesses testified at the hearing including: (1) Cabinet social worker and

---

[3] Both children were born prior to the establishment of Kentucky's putative father registry by Kentucky Revised Statute ("KRS") 199.503.

[4] The children were placed in the same foster home, and their underlying juvenile cases were handled concurrently. The family court conducted the termination of parental rights proceedings for Child 1 and Child 2 at the same time, and its findings of facts and conclusions of law refer to both children.

the family's ongoing caseworker, Bobbye McClain ("SW McClain"); (2) the children's therapist, Michelle New ("Therapist New"); Father; Mother; and Father's ex-wife. We have reviewed all the testimony and summarize only those facts necessary to a proper understanding of this appeal.

Following the children's placement in foster care in March 2021, the Cabinet attempted to offer reunification services to Father. SW McClain testified about her efforts to locate Father, which included conducting home visits at any addresses associated with him and sending follow-up letters. Despite those efforts, SW McClain received no response and was unable to locate him for several months.

Contact occurred by happenstance on June 18, 2021, when Father was at Mother's house during one of SW McClain's home visits. At that time, Father acknowledged his awareness of the children's placement in foster care but stated that he lacked stable housing and lived "place to place." SW McClain provided Father with her contact information and instructions to schedule a reunification case planning conference. Father, however, did not contact SW McClain until September 8, 2022, nearly 15 months after that chance encounter and four months after the Cabinet petitioned to terminate parental rights. During this phone call, Father requested a reunification case planning conference, and one was scheduled for September 13, 2022. Father failed to attend.

Once again, SW McClain resumed efforts to locate Father, and another eight months passed without any contact. On May 4, 2023, Father's then ex-wife[5] called SW McClain on his behalf, stating that Father had been "clean" or drug free for one month and that he desired to work toward reunification with his children. SW McClain reviewed a case plan with Father over the phone, which he subsequently signed at the rescheduled case planning conference on May 22, 2023. This case plan included completing assessments for domestic violence, substance abuse, and mental health, and following all recommendations. He was also required to make daily phone calls to see if he was required to submit to a random drug screen.

Following the May 2023 conference, Father followed through on some case plan objectives. He maintained steady full-time employment and suitable living conditions. SW McClain testified that Father completed his three assessments and enrolled in a substance abuse program in Hopkinsville, Kentucky. All the same, SW McClain characterized Father's progress toward reunification as "not very good."

SW McCain expressed serious concern over Father's noncompliance with the recommendations from his domestic violence assessment, which included completion of a batterer's intervention program and a parenting course. SW

---

[5] Father remarried his ex-wife in August 2023.

McClain maintained that her records were void of any proof of enrollment or completion of those programs. On cross-examination, Father's counsel presented certificates of completion for domestic violence and parenting courses from an online learning institute. The certificates stated that Father completed a four-hour class and written knowledge test for each subject matter of concern. SW McClain testified that she was not provided with nor even aware of these certificates prior to their introduction at the hearing. Moreover, while she was unfamiliar with the issuing online platform, she considered a four-hour class on domestic violence insufficient given Father's history and believed that the 26-week batterer's intervention program as recommended from his assessment was more appropriate. She echoed similar reservations as to the sufficiency of a four-hour parenting class.

SW McClain testified that Father initially did well in keeping to the daily call schedule for random drug testing. Those efforts, however, dwindled to eight calls in September 2023, zero calls in October 2023, and three calls in November 2023. Overall, from May 2023 until the final hearing in November 2023, Father submitted to a total of eight drug screens, none of which tested positive for drugs. Of note, Father was not screened for alcohol.

In July 2023, Father was charged with operating a motor vehicle with an alcohol concentration of or above 0.08 ("DUI") under KRS 189A.010, which he did not immediately reveal to SW McClain. He pled guilty to that DUI in October

2023. That same month, however, he was charged with a second DUI, and his reunification case plan was amended to include parenting and alcohol assessments. The second DUI matter was still pending at the time of the termination hearing.[6] These recent alcohol-related offenses understandably concerned SW McClain, but she also expressed her reservations about the children's ability to bond with Father.

SW McClain observed the children's reservation and apprehension regarding the potential reunification. Prior to their Cabinet commitment, the children had little to no stability in their home lives and witnessed domestic violence against Mother. Upon being placed in foster care, both children repeated their respective grade levels in school. Both children were diagnosed with generalized anxiety and attention deficit hyperactivity disorder. They received speech therapy in addition to mental health counseling. After two years in foster care, SW McClain testified that the children were integrated and bonded with their foster family and referred to the foster parents as "mom" and "dad." Their performance in school had improved and even excelled at times with both children making honor roll.

After the May 2023 conference, the Cabinet arranged for supervised visitation between Father and the children, but based on recommendations from the

---

[6] At the final hearing on November 20, 2023, Father tendered a letter from a local counseling agency documenting that he reported to the center on November 9, 2023 for an alcohol assessment, but it was postponed until after resolution of his second case.

children's therapist, modified visitation to weekly phone calls. For the most part, Father kept to the weekly call schedule, missing only three visits.[7] SW McClain supervised these visits and observed the children's apparent resentment and lack of interest in talking to Father. On at least one occasion, SW McClain testified that Child 1 hid in an office closet and refused to participate in the scheduled call. She admitted that they demonstrated more interest during the call when Father asked what they wanted for birthday presents.

Therapist New also testified on behalf of the Cabinet. She began treating the children in August 2022 and employed therapeutic models such as cognitive behavioral therapy, play therapy, and trauma-focused cognitive therapy. She noted the children's difficulty in forming bonds, establishing trust, and taking responsibility for their actions and behaviors. She testified that she had faced challenges in getting the children to trust her, but with the assistance of the foster family, she and the children were able to work through some of those barriers so that the children viewed therapy as a "safe space." When questioned about providing family counseling sessions, she opined that the children did not want a relationship with Father and inviting him into their therapy sessions could undermine their sense of safety. She noted that the children consistently express fear of emotional and physical harm from both Mother and Father. If the court

---

[7] One of the three missed visits was due to Father's incarceration for driving under the influence.

ordered family counseling, Therapist New doubted that the children would agree to participate and forcing them to do so would be counterproductive. As noted by the family court, Therapist New could not discern a parental bond between the children and Father.

During Father's testimony, he admitted to leaving his children with Mother sometime in 2020 and having virtually no contact with them nor offering any financial support to them between March 2021 and May 2023. He blamed his lack of contact and effort on his drug addiction and homelessness, claiming that it was best for the children that he did not work toward reunification during those two years. Father acknowledged his lengthy history of substance abuse but testified to being clean for nine months. He attributed this sobriety to his own efforts and resolve, claiming that he did not need a rehabilitation program. When questioned about drinking alcohol and driving under the influence, Father simply stated that he regretted that decision.

Despite receiving two DUI charges over the course of four months, Father testified that his life was finally in order. He reunited with his ex-wife in early 2023 and moved in with her in Hopkinsville. They eventually remarried and kept a suitable home. He also testified to full-time employment making $14 per hour and described his attempts to initiate child support payments.

While Father conceded that he should have made efforts sooner, he also expressed his dissatisfaction with SW McClain, including accusations that she limited his weekly phone calls with the children to only three or four minutes[8] and that she did not assist him with finding programs closer to his home in Hopkinsville. Regardless, Father expressed his willingness to continue working toward reunification with his children and his hope that they would eventually be returned to him.

Following the hearing, the family court took the matter under advisement noting the seriousness of the hearing and the need to reflect on the evidence submitted. On December 11, 2023, the family court entered a 14-page order containing findings of fact and conclusions of law and terminating Father's parental rights to Child 1 and Child 2.[9]

---

[8] Counsel for Father introduced and played a recording of a telephone visit between Father and the children in support of this contention. To Father's point, the visit lasted approximately three minutes before SW McClain ended the call. The content of the recording, however, contained many lulls in the conversation that were filled with background sounds of the children playing or otherwise making noise. Father asked general questions such as how the children were doing and if they needed anything such as school supplies. In response to these questions, at least one of the children would give one-word answers. Toward the end of the call, Father told the children that he loved and missed them. The children did not reply, and the recording fell quiet for several seconds. Father again asked if they were okay, and one of the children said "yeah." Another 10 or so seconds passed without anyone speaking, at which point SW McClain suggested ending the call.

[9] On December 21, 2023, Father filed motions pursuant to Kentucky Rules of Civil Procedure ("CR") 59.05 and 52, to vacate, alter, or amend the family court's order. By order entered on February 8, 2024, the family court overruled in part and sustained in part Father's motions, clarifying that it terminated Father's parental rights and made a finding of abandonment by clear and convincing evidence under KRS 625.090(2)(a). The family court further clarified that its

## ANALYSIS

Father's appointed counsel filed an *Anders* brief in compliance with *A.C.*, 362 S.W.3d 361. In *A.C.*, this Court adopted and applied the procedures identified in *Anders*, 386 U.S. 738, regarding appeals from orders terminating parental rights where counsel cannot identify any nonfrivolous grounds to appeal. *A.C.*, 362 S.W.3d at 371. Those procedures require counsel to first engage in a thorough and good faith review of the record. *Id.* "[I]f counsel finds his [client's] case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw." *Id.* at 364 (quoting *Anders*, 386 U.S. at 744).

Father's appointed counsel complied with the requirements of *A.C.* and *Anders* by providing Father with a copy of the brief and informing him of his right to file a *pro se* brief raising any issues he found meritorious. *A.C.*, 362 S.W.3d at 371. Father has not filed a *pro se* brief. Per *A.C.*, we have closely examined the record and the law and agree with counsel that no grounds exist that would warrant reversing the family court's order terminating Father's parental rights.

---

findings under KRS 625.090(2) subsections (e) and (g) pertained only to Mother. As to Father, the family court found no reasonable expectations of improvement in parental care and protection, and in Father's conduct in the immediately foreseeable future.

The applicable standard of appellate review of findings by the family court in a termination of parental rights case is the clearly erroneous standard; therefore, the findings of fact will not be set aside unless unsupported by substantial evidence. *M.L.C. v. Cabinet for Health & Fam. Servs.*, 411 S.W.3d 761, 765 (Ky. App. 2013); CR 52.01. A family court has broad discretion in determining whether the best interests of the child warrant termination of parental rights. *C.J.M. v. Cabinet for Health & Fam. Servs.*, 389 S.W.3d 155, 160 (Ky. App. 2012).

Kentucky Revised Statute 625.090 sets forth the requirements that must be met before a family court may involuntarily terminate parental rights. First, the family court must determine whether the child is abused or neglected or whether the child was previously determined to be abused or neglected by a court of competent jurisdiction. KRS 625.090(1)(a). Additionally, a petition seeking the termination of parental rights must have been filed by the Cabinet pursuant to KRS 620.180 or KRS 625.050. KRS 625.090(1)(b). Second, the family court must find the existence of one or more of the eleven grounds set forth in KRS 625.090(2)(a)-(k). The findings required by KRS 625.090(1)-(2) must be established by clear and convincing evidence. Third, the family court must find that the termination of parental rights would be in the child's best interest, KRS 625.090(1)(c), and the

court is provided with a series of factors that it shall consider when making this determination, KRS 625.090(3).

In the matter before us, each of the statutory requirements was met, and we may not disturb the findings of the family court as they are supported by substantial evidence. *See M.L.C.*, 411 S.W.3d 761. Under the first element, KRS 625.090(1), the family court found that the children were previously adjudged to be neglected by that court in their underlying juvenile actions. Moreover, based solely on the evidence presented at the hearing, the family court held that the children qualified as neglected children under KRS 600.020(1) by clear and convincing evidence based on the following: (1) Father continuously or repeatedly failed or refused to provide essential parental care and protection to the children given their ages, KRS 600.020(1)(a)4.; (2) Father failed to provide adequate care, supervision, food, clothing, shelter, and education or medical care necessary for the children's well-being, KRS 600.020(1)(a)8.; and (3) Father failed to make sufficient progress toward identified goals set forth in his court-approved case plans to enable the safe return of the children to his care, and that this failure resulted in the children's commitment to the Cabinet and placement in foster care for 15 cumulative months out of 48 months, KRS 600.020(1)(a)9. Finally, the record reflects that the Cabinet filed petitions to terminate Father's parental rights to the children on May 12, 2022.

Under the second element, the family court found that Father abandoned the children for a period of more than 90 days under KRS 625.090(2)(a). This finding was supported by Father's own testimony, in addition to other evidence presented by the Cabinet and is likewise supported by clear and convincing evidence.

As to the children's best interests, the family court found, pursuant to KRS 625.090(3)(e), that the children's physical, emotional, and mental health improved after being placed in Cabinet custody. Moreover, the evidence supported the prospect of the children's continued welfare should parental rights be terminated. *Id.* Both children had been behind in school and required to repeat a grade level, but after being in Cabinet custody, they made honor roll. While the children were still working through the trauma resulting from their neglect, they made great strides in their willingness to participate in therapy and their ability to form bonds with their foster family. By contrast, testimony from SW McClain and Therapist New revealed the children's strong resistance to bonding with Father. Even with continued therapy or even family counseling, there was no guarantee that the children's barriers would be lessened.

At the final hearing, Father contested the Cabinet's efforts to reunify the family, accusing SW McClain of hindering or interfering with his visitation and location of services. As the family court rightfully observed, Father wished for the

court to primarily consider his progress in the six months leading up to the final hearing. We agree with the family court that Father's accusations must be tempered with the undisputed circumstances occurring prior to May 2023.

Before the Cabinet petitioned for termination of parental rights, it had attempted to render services to Father meant to encourage reunification, but Father was nowhere to be found. The Cabinet extended its offer of services to Father at the first available opportunity at that chance encounter in June 2021. Father was aware that his children were in foster care and yet did not reach out for services for over a year. Even when Father did finally call SW McClain in September 2022, his efforts toward reunification were unconvincing; he failed to appear for his case-planning conference and did not reach out again for another eight months.

It was not lost on the family court, nor this Court, that while Father made significant improvements in his own life during those final months, his rather bold claim of treating his addiction through his own resolve was belied by his alcohol use and resulting criminal charges. As the family court stated, "the court must consider children's best interests, not parents' best interests. The court is not willing to jeopardize these children's immediate need for permanency by waiting to see if [Father]'s recent progress continues. The children's young ages and extended period in foster [care] make the need even more compelling."

## CONCLUSION

The family court's findings are supported by substantial evidence, and all statutory requirements for involuntary termination of parental rights were met. No nonfrivolous grounds for appeal are found in the record. For these reasons, and with due regard to the serious consequences of involuntary termination on both Father and the children, we find no error and affirm the judgments on appeal.

ALL CONCUR.


BRIEF FOR APPELLANT:                    BRIEF FOR APPELLEE:

Jennifer Caudill Bundy                       Kevin Martz
London, Kentucky                            Covington, Kentucky